ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br><br>Apelado<br><br>v.<br><br>**WILFREDO RODRÍGUEZ RODRÍGUEZ**<br><br>Apelante | KLAN202300963 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de **Bayamón**<br><br>Criminal Núm.:<br>**D LA 2011G0652**<br><br>Sobre:<br>Art. 5.07 L.A. |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de diciembre de 2024.

Comparece ante nos Wilfredo Rodríguez Rodríguez (Rodríguez Rodríguez o apelante) mediante *Recurso de Apelación*, y nos solicita que revoquemos la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI), el 28 de septiembre de 2024. Mediante esta, el TPI declaró culpable al apelante en el caso D LA2011G0652 y lo condenó a cumplir veinticuatro (24) años de cárcel por la infracción al Artículo 5.07 de la Ley Núm. 404-2000, *infra*.

Por los fundamentos que discutimos a continuación, confirmamos la *Sentencia* apelada.

**I.**

Por hechos ocurridos el 14 de julio de 2011, el Ministerio Público presentó acusaciones en contra de Rodríguez Rodríguez en los siguientes casos: D SC2011G0427, D SC2011G0428, D LA20110651, D LA20110652, D LA20110653, D LA20110654 y D

DS2011M0115.[1] En lo pertinente al caso ante nuestra consideración, el Ministerio Público presentó la siguiente acusación en el caso D LA20110652, en contra de Rodríguez Rodríguez:

> El referido acusado, FELIX OTERO TORRES, actuando en concierto y común acuerdo con otras personas, allá en y para el día 14 de julio de 2011, en Toa Baja, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala Superior de Bayamón, Puerto Rico, ilegal, voluntaria, maliciosa y criminalmente, PORTABA Y CONDUCIA, una PISTOLA MARCA GLOCK, MODELO 23, SERIE CFX-278, COLOR NEGRA, CALIBRE 40, cargada con 23 municiones y una en la recamara, que puede ser disparada automáticamente, la cual es un arma mortífera de las estrictamente prohibidas por la ley de armas de Puerto Rico. Al momento de portar y conducir dicha arma, lo hacía desprovisto de una licencia o permiso especial que para tales fines expide el Superintendente de la Policía de Puerto Rico y/o el Tribunal de Primera Instancia de Puerto Rico.[2]

Los días 21, 26, 27, 28 de octubre de 2015 y 17 de noviembre de 2015 se celebró vista de supresión de evidencia.[3] Ante ello, el TPI declaró Con Lugar la supresión de evidencia en los casos D SC2011G0427, D SC2011G0428, D LA20110651, D LA20110653, D LA20110654 y D DS2011M0115.[4] Sin embargo, el foro primario declaró No Ha Lugar la supresión de evidencia en el caso D LA2011G0652, por el delito del Artículo 5.07 de la Ley Núm. 404-2000, según enmendada, conocida como *Ley de Armas de Puerto Rico*, 25 LPRA sec. 455 (Ley de Armas de 2000) (Derogada). En consecuencia, el Ministerio Público solicitó el archivo de los casos en los que se declaró Con Lugar la supresión de evidencia, por lo que el TPI desestimó los mismos.[5]

Culminados los trámites procesales de rigor, se celebró juicio en su fondo por tribunal de Derecho los días: 7 y 9 de junio de 2016;

---

[1] Véase Autos originales del caso DLA2011G0652 (TOMO I).
[2] Véase *Acusación* en los autos originales del caso DLA2011G0652 (TOMO I). Surge del expediente de los autos originales que se aclaró que el nombre del acusado era Wilfredo Rodríguez Rodríguez y no Felix Otero Torres.
[3] *Vista Supresión de Evidencia* del 21, 26, 27, 28 de octubre de 2015 y 17 de noviembre de 2015 de los autos originales del caso DLA2011G0652 (TOMO I).
[4] *Alegato del Apelante*, Anejo 7, págs. 44-49.
[5] *Minuta* del 5 de abril de 2015 en los autos originales del caso DLA2011G0652 (TOMO I).

5 de octubre de 2016; 6 de diciembre de 2016; 24 de enero de 2017; 21 de abril de 2017 y 5 de mayo de 2017.[6] La prueba del Ministerio Público consistió en el testimonio de los testigos de cargo y la prueba documental.

A continuación, resumiremos los aspectos relevantes de los testimonios de los testigos del Ministerio Público.

**Agente Érica Berrios Rodríguez**

El desfile de prueba comenzó con el testimonio de la agente Érica Berrios Rodríguez (agente Berrios Rodríguez). A preguntas del Ministerio Público esta indicó que era agente de la Policía asignada a la División de Drogas en la jurisdicción de Bayamón.[7] Testificó que, el 14 de julio de 2011, el sargento Jesse Marrero autorizó el diligenciamiento de varias órdenes de arresto de una investigación que había realizado el agente Daniel Vega Montalvo (agente Vega Montalvo), en un conocido punto de droga ubicado en el sector Villa Olga, en Toa Baja, específicamente en el negocio Pistons Sport and Bar.[8] Aclaró que habían seis (6) órdenes de arresto, y que a ella le correspondía el diligenciamiento de dos (2) de éstas, contra Osvaldo Pastrana Román (Pastrana Román), ya que tenía pleno conocimiento de quien era este.[9] Sobre esto último, indicó que conocía a Pastrana Román, debido a que lo había grabado en Villa Olga entregando un paquete de droga a una persona que iba a fungir como tirador.[10] Asimismo, señaló que los delitos de las órdenes de arresto tenían fecha del 19 de enero de 2011 y del 2 de febrero de 2011.[11]

La agente Berrios Rodríguez declaró que el día de los hechos contaba con una patrulla rotulada e iba en unión con la agente

---

[6] *Minuta* del 7 y 9 de junio de 2016, 5 de octubre de 2016, 6 de diciembre de 2016, 24 de enero de 2017, 21 de abril de 2017, y 5 de mayo de 2017, en los autos originales del caso DLA2011G0652 (TOMO I).
[7] Transcripción de la Prueba Oral (TPO), pág. 12.
[8] TPO, pág. 14.
[9] TPO, pág. 15.
[10] TPO, pág. 16.
[11] TPO, págs. 15-16.

Xiomara Méndez Candelaria (agente Méndez Candelaria) y el agente Daniel Vega Montalvo (agente Vega Montalvo); a este último le correspondía identificar la casa de Pastrana Román.[12] Narró que, llegaron aproximadamente a las 3:30 am, a la calle Guayaba en las parcelas Villa Olga.[13] Señaló, además, que se estacionaron frente al Colmado los Muchachos, el cual quedaba en la calle Guayaba.[14] Una vez allí, el agente Vega Montalvo identificó la casa de Pastrana Román.[15] La agente Berrios Rodríguez describió la casa como una en madera y *zinc*, de altos en columnas y de color rosita con azul clarito.[16] Añadió que, frente a la residencia había otra casa, y en medio de esta, un callejón que llevaba a la casa de Pastrana Román.[17]

Continuó narrando que, observó que la casa tenía una luz encendida y que salió del interior, hacia el balcón, un individuo con *T-shirt* negra y gorra negra; que este estiró los brazos y se quedó mirando la patrulla.[18] Señaló que, el individuo entró rápidamente a la residencia.[19] Asimismo, testificó que, se desmontaron de la patrulla y caminaron hacia el callejón.[20] Explicó que, lograron acceso al callejón debido a que el agente Vega Montalvo había empujado el portón.[21] Expresó que, una vez allí, observaron a dos individuos en los bajos de la casa, uno con *T-shirt* blanca sentado, y el otro parado y sin camisa.[22] Añadió que, en ese momento gritó "policía" y el individuo que estaba sin camisa se volteó hacia ellos y les apuntó con un rifle, por lo que el compañero Vega Montalvo realizó una detonación.[23] Mencionó, también, que su compañera

---

[12] TPO, pág. 16.
[13] TPO, pág. 19.
[14] *Íd.*
[15] *Íd.*
[16] TPO, págs. 19-20.
[17] TPO, pág. 20.
[18] TPO, págs. 20-21.
[19] TPO, pág. 21.
[20] TPO, págs. 21-22.
[21] TPO, pág. 22.
[22] TPO, pág. 23.
[23] *Íd.*

Méndez Candelaria se encontraba en la parte de atrás de ella, y ambas buscaron *cover*.[24]

En su testimonio, la agente Berrios Rodríguez señaló que pudo observar que los dos (2) individuos que estaban en la parte de abajo de la residencia corrieron hacia el lado izquierdo de la misma, mientras que de arriba salieron varios individuos, uno de estos con *T-shirt* amarilla, a quien pudo identificar como Pastrana Román.[25] Apuntó que Pastrana Román salió armado con una pistola en la mano derecha color negro.[26] Mencionó que luego de Pastrana Román salió un individuo de *T-shirt* roja y otro de *T-shirt* negra, quienes también salieron con una pistola negra en la mano derecha.[27] La agente Berrios Rodríguez identificó en corte a Rodríguez Rodríguez como la persona con *T-shirt* roja.[28] Además, testificó que observó a los individuos brincar una verja, la cual ella intentó brincar pero no pudo.[29] En ese instante tiró por radio, ya que Pastrana Román, Rodríguez Rodríguez y el individuo de *T-shirt* negra se dirigían hacia su compañera, la agente Nancy Méndez Acevedo (agente Méndez Acevedo), quien se encontraba en la parte posterior de la residencia para velar el perímetro.[30] Añadió, además, que la agente Méndez Candelaria se había ido en dirección hacia el individuo de camisa blanca y que el agente Vega Montalvo había corrido hacia la residencia.[31]

Expresó la agente Berrios Rodríguez que, luego de que no pudo saltar la verja, tomó la decisión de subir a la residencia por seguridad, para verificar si había alguien más armado.[32] Indicó que, adentro de la casa observó, sobre una mesa de la sala, dos pistolas

---

[24] TPO, pág. 24.
[25] *Íd.*
[26] *Íd.*
[27] TPO, pág. 25.
[28] TPO, pág. 30.
[29] *Íd.*
[30] *Íd.*
[31] TPO, pág. 31.
[32] TPO, pág. 32.

*Glock,* dinero y una bolsa con bastante picadura de marihuana.[33] También, señaló que, se movió por la casa y en la cama de uno de los cuartos había un bulto color negro, de donde sobresalían varios magazines, todos con balas.[34] Continuó testificando que, luego del recorrido de la casa, salió hacia el pasillo y se encontró con la agente Méndez Candelaria, quien le comunicó que no había arrestado a los dos individuos, pero que sí había ocupado el rifle del individuo sin camisa.[35] Además, también mencionó que le comunicó a Méndez Candelaria que había droga, dinero y armas en la residencia.

La agente Berrios Rodríguez testificó que ocupó un arma *Glock,* cargada con veintiséis (26) municiones punto cuarenta y pico, una (1) de ellas en la recámara, la cual tenía un aditamento de automática.[36] Además, narró que posteriormente se movió a la patrulla en donde estaba la agente Méndez Acevedo, quien le mencionó que había ocupado la pistola que Pastrana Román había lanzado, pero que no había podido arrestarlo; añadió que arrestó a Rodríguez Rodríguez, y que había ocupado una pistola.[37] Asimismo, sostuvo que luego se enteró que el agente Vega Montalvo había ocupado otra arma de fuego y había arrestado al individuo de *T-shirt* negra.[38]

Durante el contrainterrogatorio admitió que había prestado una declaración jurada el 7 de septiembre de 2011, esto es, cincuenta y cinco (55) días después del día de los hechos.[39] Además, admitió que para el 14 de julio de 2011, no había una orden de registro y allanamiento contra la propiedad de Pastrana Román.[40] A preguntas de la defensa señaló que cuando estaba con el compañero

---

[33] TPO, pág. 33.
[34] *Íd.*
[35] TPO, pág. 34.
[36] *Íd.*
[37] TPO, págs. 34-35
[38] TPO, pág. 36.
[39] TPO, págs. 40-42.
[40] TPO, pág. 44.

Vega Montalvo y la compañera Méndez Candelaria frente al portón de la casa, no vio al interior del callejón persona sin camisa, ni con camisa blanca; tampoco vio a persona alguna armada; que cuando observó al individuo con *T-shirt* negra y gorra negra salir al balcón, este no tenía ningún material delictivo, ni estaba armado.[41] Igualmente, dijo que cuando estaba frente al portón tampoco pudo observar algo ilegal al interior de la residencia o en el espacio de terreno.[42] Admitió, a preguntas de la defensa, que no menciona en su declaración jurada que cuando los individuos bajaron las escaleras, estuvieran armados.[43] Señaló que no dice en la declaración jurada que los vio brincar la verja con armas.[44] También admitió durante el contrainterrogatorio que, antes de que el hombre sin camisa se volteara, ya ella se encontraba en propiedad privada sin haber recibido autorización del dueño para entrar.[45] Tampoco señaló en la declaración jurada que la agente Méndez Acevedo le haya indicado que la persona de la *T-shirt* roja fue arrestada porque tenía un arma de fuego.[46]

**Agente Méndez Candelaria**

El desfile de prueba continuó con el testimonio de la agente Méndez Candelaria. Esta testificó que era agente de la División de Drogas y Narcóticos de Bayamón.[47] Narró que, el 14 de julio de 2011, tomó servicio y le asignaron el diligenciamiento de una orden de arresto contra Joshua.[48] Añadió que ese día, el agente Vega Montalvo, la agente Berrios Rodríguez y ella, se dirigieron a la calle Guayaba y se estacionaron frente al Colmado los Muchachos.[49] La agente Méndez Candelaria testificó que cuando llegaron al lugar, el

---

[41] TPO, págs. 52-54.
[42] TPO, pág. 54.
[43] TPO, pág. 74.
[44] *Íd.*
[45] TPO, pág. 80.
[46] TPO, pág. 87-95.
[47] TPO, pág. 116.
[48] TPO, pág. 118-119.
[49] TPO, pág. 120-121.

agente Vega Montalvo le identificó a la agente Berrios Rodríguez la residencia donde se encontraba la persona que esta iba a arrestar.[50] Añadió que se quedó mirando hacia la residencia, la cual tenía las luces encendidas, y salió del interior una persona con camisa negra hacia el balcón, pero que esta última se percató de la patrulla y entró nuevamente.[51]

Narró que, decidieron entrar a un callejón, el cual daba acceso a la residencia a través de un portón.[52] Continuó testificando que, cuando lograron acceso, desenfundó su arma de reglamento por motivos de seguridad y vio a dos personas en los bajos de la residencia.[53] Explicó que uno de los individuos se encontraba sin camisa y el otro tenía una de color claro.[54] Señaló que, les indicó que era la policía y uno de los individuos se volteó y les apuntó con un rifle, por lo que en ese momento escuchó una detonación que había sido realizada por el agente Vega Montalvo.[55] De este modo, mencionó que buscó *cover* con la agente Berrios Rodríguez y luego los individuos salieron corriendo hacia el lado izquierdo, en donde había un muro.[56] Sostuvo que, también observó celajes de los individuos que estaban saliendo de la casa de arriba.[57] Continuó declarando que, siguió observando a los individuos que estaban corriendo, vio que ambos brincaron el muro y uno de ellos soltó el rifle cuando saltó.[58] Así pues, señaló durante el interrogatorio directo que ocupó el rifle.[59]

La agente Méndez Candelaria adujo que, procedió a subir unas escaleras, se asomó por una puerta, y vio a la agente Berrios

---

[50] TPO, pág. 121.
[51] TPO, pág. 122.
[52] TPO, págs. 122-123.
[53] TPO, pág. 123.
[54] *Íd.*
[55] TPO, págs. 124-125.
[56] TPO, págs. 125-126.
[57] TPO, págs. 126-127.
[58] TPO, pág. 127-128.
[59] TPO, págs. 128-129.

Rodríguez salir de un cuarto al final del pasillo.[60] Señaló que, le comentó a la agente Berrios Rodríguez que no había podido arrestar al individuo que tenía el rifle ni al otro, porque habían saltado el muro; pero dijo que sí ocupó el rifle porque lo habían dejado caer o se le había caído.[61] También señaló que, la agente Berrios Rodríguez le había indicado que había ocupado armas de fuego, droga, balas y dinero.[62] Aclaró, además, que ella solo llegó hasta el área de la puerta.[63]

Testificó la agente Méndez Candelaria que, luego de que se ocupó la evidencia, salieron a la calle principal y depositó el rifle en una patrulla rotulada.[64] Describió el rifle ocupado como un Ruger mini catorce (14), cargado con treinta y cinco (35) balas, calibre .223 y una de esas balas se encontraba en la recámara.[65] Asimismo, indicó que la agente Berrios Rodríguez se quedó custodiando la evidencia que ocupó, la que también había sido depositada en la patrulla.[66] Igualmente, narró que el agente Vega Montalvo fue a verificar a un individuo que había visto tirado por la parte de atrás de la residencia, por lo que trepó el muro y dijo que había visto un arma; esta fue ocupada por el agente.[67] En el interrogatorio también señaló que se arrestó a Rodríguez Rodríguez, quien fue identificado en corte.[68]

Durante el contrainterrogatorio, la agente Méndez Candelaria admitió que no vio personas al momento de abrir el portón y que nadie los autorizó a entrar.[69] También admitió, a preguntas de la defensa, que cuando entraron, las dos (2) personas que estaban más adelante del callejón se veían dialogando; que el que apuntó con el

---

[60] TPO, pág. 130.
[61] *Íd.*
[62] *Íd.*
[63] *Íd.*
[64] *Íd.*
[65] TPO, págs. 130-131.
[66] TPO, pág. 131.
[67] TPO, págs. 131-132.
[68] TPO, pág. 133.
[69] TPO, págs. 139-140.

rifle nunca disparó.[70] También admitió que fue el agente Vega Montalvo quien primero hizo una detonación.[71]

**Agente Vega Montalvo**

El agente Vega Montalvo declaró que pertenecía a la División de Drogas y Narcóticos de Bayamón.[72] Señaló que, el 14 de julio de 2011, se encontraba en servicio para diligenciar varias órdenes de arresto.[73] Sostuvo que, ese día se dirigió en una patrulla hacia Pistons Sport Bar en el Barrio Pájaros, sector Villa Olga, junto con la agente Berrios Rodríguez y la agente Méndez Candelaria.[74] Explicó que, las órdenes de arresto eran contra Pastrana Román, Víctor Matos, Jonathan Ofre, Joshua Chaparro y Antonio Chaparro, y que su función sería marcar las casas en donde se diligenciarían las referidas órdenes.[75]

Continuó narrando que, cuando llegaron al lugar de los hechos, se estacionaron frente al Colmado los Muchachos. Asimismo, mencionó que la primera orden que se iba a diligenciar era contra Pastrana Román, quien residía en una casa ubicada al lado del colmado.[76] La casa fue descrita por el agente Vega Montalvo como una estructura de madera en un segundo piso, abajo abierta y en soco de cemento.[77]

Señaló el agente Vega Montalvo que, cuando se bajó de la patrulla, observó las luces de la casa encendidas.[78] También declaró que salió hacia el área del balcón de la casa, un caballero de tez trigueña clara, con gorra negra y *T-shirt* negra, que extendió sus manos; añadió que este volvió a entrar a la casa cuando los observó a ellos.[79]

---

[70] TPO, pág. 140.
[71] TPO, pág. 141.
[72] TPO, pág. 140.
[73] TPO, pág. 148.
[74] TPO, págs. 150-153.
[75] TPO, págs. 150-151.
[76] TPO, pág. 154.
[77] *Íd.*
[78] *Íd.*
[79] TPO, págs. 154-155.

Continuó con su testimonio mencionando que abrió un portón de la residencia y entró a un callejoncito que daba para la casa.[80] Narró que se dirigió hacia la estructura, con sus compañeras Méndez Candelaria y la agente Berrios Rodríguez detrás de él.[81] Explicó que, debajo de la estructura habían dos personas, una tenía una *T-shirt* blanca, la cual estaba hablando con el otro individuo que no tenía camisa.[82] Expresó, además, que el individuo sin camisa se volteó y tenía un arma larga en sus manos.[83] De este modo, el agente Vega Montalvo testificó que, desenfundó su arma de reglamento, se identificó como policía y realizó una detonación hacia donde estaban los individuos.[84] Aclaró que, cuando hizo la detonación, sus compañeras se encontraban detrás de él y los individuos salieron corriendo para el lado izquierdo de la residencia.[85] Sostuvo que, buscó *cover* para llegar a las escaleras, y observó que bajaban de la residencia Pastrana Román- quien vestía una *T-shirt* color amarilla, un individuo con *T-shirt* colorada, a quien identificó en corte como Rodríguez Rodríguez, y una persona con *T-shirt* negra y gorra negra, que fue identificada como José.[86] Expresó que, estas tres (3) personas tenían pistola en mano.[87]

El agente Vega Montalvo declaró que Rodríguez Rodríguez y Pastrana Román brincaron por la parte de atrás, y José corrió hacia el lado izquierdo.[88] Igualmente, señaló que antes de brincar, se identificó como policía y José le apuntó con una pistola.[89] Añadió que, buscó *cover* y escuchó a la agente Berrios Rodríguez indicar,

---

[80] TPO, pág. 155.
[81] TPO, págs. 155-156.
[82] TPO, pág. 156.
[83] *Íd.*
[84] TPO, pág. 157.
[85] *Íd.*
[86] TPO, págs. 160-161.
[87] TPO, pág. 161.
[88] TPO, pág. 162.
[89] *Íd.*

por radio de la policía, que esas personas estaban corriendo por la parte de atrás.[90]

Mediante su testimonio, el agente Vega Montalvo, señaló que posteriormente regresó a la patrulla, donde Rodríguez Rodríguez se encontraba detenido, ya que había sido arrestado por la agente Nancy Méndez.[91] Mencionó también que, continuó diligenciando las órdenes de arresto y luego se enteró que sus compañeras habían ocupado diferentes municiones.[92] Asimismo, narró que decidió regresar al área donde habían corrido los individuos, trepó el muro, y con un *flash light* identificó- a unos cuatro (4) pies- un arma de fuego.[93] Además, expresó que encontró a una persona en posición fetal, a quien identificó como la persona con *T-shirt* negra y gorra negra; esta tenía una pierna rota y recibió atención médica.[94]

Durante el turno de contrainterrogatorio, el agente Vega Montalvo testificó que prestó una declaración jurada, el 7 de septiembre de 2011, sobre los hechos del caso.[95] Admitió, a preguntas de la defensa, que cuando llegó a la residencia y vio a Pastrana Román en la parte de arriba, este no estaba cometiendo ningún delito.[96] También dijo que, no tenía orden de registro contra la residencia.[97] Testificó, además, que en su declaración jurada no mencionó que haya visto a Rodríguez Rodríguez el día de los hechos.[98] Asimismo, admitió que dijo que observó a la persona de *T-shirt* roja con arma en mano cuando bajaba las escaleras, pero que no dice en su declaración jurada que estaba con arma en mano cuando brincó el muro.[99] Igualmente, expresó que no señala en su declaración jurada que haya visto a Rodríguez Rodríguez

---

[90] TPO, págs. 163-164.
[91] TPO, pág. 166.
[92] TPO, págs. 166-168.
[93] *Íd.*
[94] TPO, págs. 169-171.
[95] TPO, pág. 176.
[96] TPO, pág. 183.
[97] *Íd.*
[98] TPO, pág. 188.
[99] TPO, págs. 189-191.

arrestado.[100] A preguntas de la defensa, adujo que en su declaración jurada no dice que escuchara a la agente Méndez Acevedo expresar que la persona que arrestó, fue arrestada con un arma.[101] De igual modo, narró durante el contrainterrogatorio que el arma que vio en la mano de Rodríguez Rodríguez no tenía un peine largo. Aclaró que, luego de que realizó la detonación cuando el individuo del rifle la apuntó, este último salió corriendo y soltó el rifle.[102]

**Agente Méndez Acevedo**

La agente Méndez Acevedo testificó que era agente de la División de Drogas de Bayamón.[103] Declaró que, el 14 de julio de 2011, tomó servicio ya que ese día se iban a diligenciar varias órdenes de arresto de una investigación realizada por el agente Vega Montalvo; que su función era vigilar el perímetro.[104] Explicó que la noche anterior había ido a ubicar a las personas que iban a ser arrestadas.[105] También expresó que esa noche ubicaron la casa de Pastrana Román.[106]

Durante su examen directo, la agente Méndez Acevedo señaló que el día de los hechos llegaron a las 3:30 am a Villa Olga y dejaron el vehículo cerca del Colmado los Muchachos.[107] Continuó narrando que se desmontaron del vehículo y escuchó dos detonaciones.[108] Asimismo, señaló que posteriormente escuchó a la agente Berrios Rodríguez indicar que pusieron bajo arresto a Pastrana Román, y que se dirigía a donde ella un individuo alto *con T-shirt* roja que estaba armado.[109] Añadió que procedió a correr hacia una de las calles y observó dos jóvenes corriendo, estos eran Pastrana Román y un individuo alto con *T-shirt* roja, a quien identificó en corte como

---

[100] TPO, pág. 191.
[101] TPO, pág. 193.
[102] TPO, pág. 204.
[103] TPO, pág. 221.
[104] TPO, págs. 223-225.
[105] TPO, págs. 226-227.
[106] TPO, pág. 227.
[107] TPO, págs. 228-233.
[108] TPO, pág. 234.
[109] *Íd.*

Rodríguez Rodríguez; ambos estaban armados.[110] También mencionó que cuando los vio corriendo, les indicó que era policía, que se detuvieran, sin embargo, estos continuaron corriendo; dijo que Rodríguez Rodríguez lanzó la pistola hacia el techo de una residencia.[111] Describió la pistola como un arma negra que le sobresalía el peine.[112] Además, testificó que luego de que tiró el arma, continuaron corriendo.[113]

La agente Méndez Acevedo señaló además que, Pastrana Román también lanzó un arma, pero esta chocó con un muro y cayó sobre la orilla de la calle.[114] De este modo, la agente Méndez Acevedo mencionó que recogió el arma que Pastrana Román tiró y la puso en su chaleco.[115] Sostuvo que logró detener a Rodríguez Rodríguez, pero perdió de vista a Pastrana Román.[116] También dijo que, luego recuperó el arma que había sido lanzada a una de las residencias.[117] Durante su testimonio describió el arma como una *Glock* punto cuarenta (.40), modelo veintitrés (23), cargada con veintitrés (23) balas, una (1) de esas en la recámara.[118]

Sostuvo que el arma tenía un aditamento y la comparó con su arma de reglamento, la cual no tenía este aditamento.[119] Según señaló, su arma de reglamento solo disparaba una bala a la vez, mientras que el aditamento permitía más de una bala.[120] Dicho testimonio fue objetado por la defensa, sin embargo, el TPI indicó que le daría el valor probatorio que estimara.[121] Igualmente, continuó narrando que volvió al Colmado los Muchachos en donde se encontró con la agente Berrios Rodríguez y le indicó que había

---

[110] TPO, págs. 238-239.
[111] TPO, pág. 241.
[112] TPO, pág. 242.
[113] *Íd.*
[114] *Íd.*
[115] *Íd.*
[116] TPO, pág. 243.
[117] TPO, pág. 247.
[118] TPO, págs. 247-248.
[119] TPO, pág. 253.
[120] TPO, págs. 252-254.
[121] TPO, pág. 254.

arrestado al individuo de la camisa roja- a quien identificó como Rodríguez Rodríguez- y que le ocupó el arma que había lanzado.[122]

Durante el interrogatorio directo de la agente Méndez Acevedo, se admitió en evidencia el Exhibit #3 del Ministerio Público, el cual era un recibo de la propiedad que se ocupó[123]. El documento aparece firmado por Rodríguez Rodríguez y se hizo constar la fecha, el nombre del apelante, el dinero que se le ocupó y el arma que se le ocupó.[124] También se admitió en evidencia, con objeción de la defensa, el Exhibit #4.[125] Este era un documento de custodia en el cual aparecía la descripción del arma ocupada, como una pistola *Glock*, modelo veintitrés (23), calibre punto cuarenta (.40), la serie Carlos Francisco Xiomara 27, un magazine, y veintitrés (23) balas punto cuarenta (.40).[126] Explicó que, esa arma se le ocupó a Rodríguez Rodríguez.[127] Por otro lado, también fue admitido el Exhibit #5 del Ministerio Público, el cual era un recibo de una solicitud de análisis pericial del Instituto de Ciencias Forenses.[128] Dicho documento fue admitido condicionadamente.[129] Del Exhibit #5 consta que, la evidencia es una pistola *Glock*, modelo veintitrés (23), punto cuarenta (.40), cachas pasta negra, número de serie Carlos Francisco Xiomara 278 y un magazine.[130] Asimismo, según el testimonio de la agente Méndez Acevedo, el resultado del informe pericial fue que disparaba.[131] Igualmente, el arma y el abastecedor fueron admitidos como Exhibits #6A y #6B del Ministerio Público, con objeción de la defensa y sujetos al valor probatorio que entendiera el TPI.[132] Señaló que, esa fue el arma que le ocupó a

---

[122] TPO, pág. 255.
[123] TPO, págs. 256-260.
[124] *Íd.*
[125] TPO, pág. 266.
[126] TPO, págs. 266-267.
[127] TPO, pág. 267.
[128] TPO, págs. 272-273
[129] TPO, págs. 273-274
[130] TPO, pág. 274.
[131] TPO, pág. 275.
[132] TPO, págs. 286-287.

Rodríguez Rodríguez el día de los hechos, y la volvió a describir como una pistola *Glock*, modelo veintitrés (23), punto cuarenta (.40), serie Carlos Francisco Xiomara 278, con un aditamento en la parte posterior.[133] También mencionó que el abastecedor era el que había sido ocupado el día de los hechos.[134]

Por otro lado, durante el contrainterrogatorio mencionó que, prestó una declaración jurada el 7 septiembre de 2011, sobre los hechos del caso.[135] Admitió que en su declaración jurada no indicó que escuchara dos detonaciones corridas.[136] Tampoco indicó en su declaración jurada que hubiese visto a Rodríguez Rodríguez con un arma con peine largo en sus manos.[137] Además, admitió a preguntas de la defensa que, en el recibo admitido como Exhibit #3 del Ministerio Público, no decía que el arma ocupada estuviera alterada, ni que tenía *chip*.[138] Admitió que fue en el Exhibit #5 del Ministerio Público, sobre solicitud de análisis del Instituto de Ciencias Forenses, que aparece por primera vez que el arma estuviera alterada; esto es, a cincuenta (58) días después de que aparece el arma en el techo.[139] Aclaró que lo de alterada lo escribió el receptor.[140] De otra parte, en el redirecto, explicó que no estableció en el Exhibit #3 que el arma tuviera *chip*, ya que es en los laboratorios que se hacen los estudios periciales.[141]

Por último, cabe señalar que durante el juicio se estipuló la siguiente evidencia: "…el certificado de examen, que es el AF112699, donde de los resultados se desprende que la pistola descrita en la pieza 1, su condición actual es capaz de disparar en automático *full*,

---

[133] TPO, págs. 279-280.
[134] TPO, pág. 280.
[135] TPO, págs. 305-306.
[136] TPo, pág. 307.
[137] TPO, pág. 309.
[138] TPO, págs. 367-368.
[139] TPO, págs. 369-370.
[140] *Íd.*
[141] TPO, pág. 395.

que este análisis lo hizo la señora Michelle Ayala Rosario, examinadora de armas de fuego...".[142]

Luego de sometido el caso por las partes, el TPI encontró culpable a Rodríguez Rodríguez por la infracción del Artículo 5.07 de la Ley de Armas de 2000, *supra*.[143] Así las cosas, el 28 de septiembre de 2023, notificada el 3 de octubre de 2023, el foro *a quo* dictó *Sentencia* en el caso D LA2011G0652. Mediante esta, condenó a Rodríguez Rodríguez a cumplir veinticuatro (24) años de cárcel por infracción al Artículo 5.07 de la Ley de Armas de 2000, *supra*.[144]

Inconforme, Rodríguez Rodríguez presentó su *Alegato del Apelante* ante esta Curia y le imputa al foro primario la comisión de los siguientes errores:

> PRIMERO: ERRÓ EL TRIBUNAL EN LA APRECIACIÓN DE LA PRUEBA ORAL Y DOCUMENTAL, AL DETERMINAR QUE EL ESTADO PROBÓ MÁS ALLÁ DE DUDA RAZONABLE LA CULPABILIDAD DEL APELANTE POR EL DELITO DEL ARTÍCULO 5.07 DE LA LEY DE ARMAS DE PUERTO RICO DEL AÑO 2000 CUANDO NO SE PROBÓ EL ELEMENTO DE DISPARAR AUTOMÁTICAMENTE QUE ESTABLECE DICHO ARTÍCULO 5.07.
>
> SEGUNDO: ERRÓ EL TRIBUNAL AL EMITIR FALLO DE CULPABILIDAD, A PESAR DE QUE EL ESTADO NO PUDO ESTABLECER, MÁS ALLÁ DE DUDA RAZONABLE, TODOS LOS ELEMENTOS CORRESPONDIENTES AL DELITO DE ARTÍCULO 5.07 DE LA LEY DE ARMAS DEL AÑO 2000, ESPECIALMENTE ANTE LA AUSENCIA DE PRUEBA SOBRE EL ESTADO MENTAL DEL APELANTE DE SABER O CONOCER QUE EL ARMA DE FUEGO IMPUTADA PODÍA SER DISPARADA AUTOMÁTICAMENTE.
>
> TERCERO: ERRÓ EL TRIBUNAL AL DECLARAR CULPABLE AL APELANTE EN EL CARGO DE ARTÍCULO 5.07 DE LA LEY DE ARMAS DEL AÑO 2000, A PESAR DE QUE LA ACUSACIÓN INSTADA POR EL MINISTERIO PÚBLICO ERA INSUFICIENTE EN DERECHO PARA QUE RECAYERA UNA CONVICCIÓN VÁLIDA EN DERECHO, YA QUE EN EL PLIEGO ACUSATORIO NO SE ALEGARON TODOS LOS ELEMENTOS DEL DELITO IMPUTADO.

---

[142] TPO, pág. 403, líneas 9-14.

[143] *Minuta* del 5 de mayo de 2017 en los autos originales del caso DLA2011G0652.

[144] Véase *Sentencia* del 28 de septiembre de 2023 en los autos originales del caso DLA2011G0652 (TOMO II).

CUARTO: ERRÓ EL TRIBUNAL AL DECLARAR CULPABLE AL APELANTE EN EL CARGO DE ARTÍCULO 5.07 DE LA LEY DE ARMAS DEL AÑO 2000, A PESAR DE QUE LA ACUSACIÓN INSTADA POR EL MINISTERIO PÚBLICO ERA INSUFICIENTE EN DERECHO PARA QUE RECAYERA UNA CONVICCIÓN VÁLIDA EN DERECHO, TODA VEZ QUE EL MINISTERIO PÚBLICO NO PRESENTÓ PRUEBA DE LA NO AUTORIZACIÓN DEL APELANTE A PORTAR O POSEER UN ARMA DE FUEGO CONFORME A DERECHO.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

## II.

## A.

"[L]a sentencia que dicta un Juez de Primera Instancia es el producto final de un activo y complejo proceso forense". L. Rivera Román, *La apreciación de prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones* en *Perspectivas en la práctica apelativa*, San Juan, Ediciones SITUM, 2018, pág. 101. Estas gozan de una presunción de corrección y la parte que impugne una determinación del Tribunal de Primera Instancia tiene el peso de la prueba para refutarla. *Íd.*; *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 128 (2019). El Tribunal Supremo de Puerto Rico ha señalado que:

> [D]e ordinario, los tribunales apelativos **aceptamos como correctas las determinaciones de hechos de los tribunales de instancia, al igual que su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en sala**. Después de todo, **la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada**, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz. Por definición, un tribunal de instancia está en mejor posición que un tribunal apelativo para llevar a cabo esta importante tarea judicial. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). (Énfasis nuestro).

"[C]omo norma general, los tribunales apelativos no intervenimos con la apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realiza [el foro de

instancia]". *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020).

Señala Luis Rivera Román que:

> En los casos criminales, la regla general dispone que, al evaluar el fallo o veredicto recaído, en la medida que los Jueces de instancia y los jurados están en mejor posición de apreciar y aquilatar la prueba presentada, su apreciación merecerá gran deferencia y los tribunales apelativos no intervendrán con esta en ausencia de pasión, prejuicio, parcialidad o error manifiesto, o cuando un análisis integral de la prueba así lo justifique. L. Rivera Román, *op. cit.*, pág. 106.

Dicho estándar de revisión requiere que para que los tribunales apelativos podamos sustituir el criterio del tribunal sentenciador, deben existir "circunstancias extraordinarias en las que **se pruebe que el foro primario actuó con pasión, prejuicio o parcialidad, incurrió en craso abuso de discreción o en error manifiesto o de derecho**". *Íd.* (Énfasis nuestro).

Un tribunal actúa con pasión, prejuicio o parcialidad cuando está "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Para determinar si el tribunal de instancia actuó con pasión, prejuicio o parcialidad, no estamos limitados a lo sucedido durante el juicio, sino podemos tomar en consideración conductas previas y posteriores a la determinación judicial. *Íd.*, pág. 788.

Para determinar si un tribunal incurrió en craso abuso de discreción, se deben considerar los siguientes criterios:

> [E]l juez no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; (2) el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en él, o (3) a pesar de tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez sopesa y los calibra livianamente. *Pueblo v. Custodio Colón*, 192 DPR 567, 589 (2015).

"Por último, un juzgador incurre en error manifiesto que justifica la intervención del tribunal apelativo cuando 'la apreciación de [la] prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble'". *Pueblo v. Rivera Montalvo*, *supra*, pág. 374. (citando a *Pueblo v. Irizarry*, 156 DPR 780, 816 (2002)).

**B.**

En nuestro ordenamiento procesal penal el derecho de un acusado a la debida notificación de los cargos presentados en su contra es de rango constitucional. Ello se desprende de la Sexta Enmienda de la Constitución federal y de la Sec. 11 del Artículo II de nuestra Constitución que dispone, en lo pertinente, que "[e]n todos los procesos criminales, el acusado disfrutará del derecho a un juicio rápido y público, a ser notificado de la naturaleza y causa de la acusación recibiendo copia de la misma...". Véase J. M. Farinacci Fernós, *La Carta de Derechos*, San Juan, Editorial Universidad Interamericana de Puerto Rico, 2021, pág. 185. Además, ese mandato constitucional se desprende del debido proceso de ley consagrado en la Enmienda Quinta de la Constitución federal y de la Sec. 7 del Art. II de la nuestra. *Pueblo v. Vélez Rodríguez*, 186 DPR 621, 627-628 (2012). El mecanismo que tiene el Ministerio Público para cumplir con esa obligación de notificación es el uso de la acusación o denuncia (pliego acusatorio) y que, a su vez, el Ministerio Público está obligado a entregar una copia al acusado. *Íd.*

Por otro lado, la Regla 35 de las Regla de Procedimiento Criminal, 34 LPRA Ap. II, R. 35, establece todo lo relacionado al contenido de la denuncia o acusación, según sea el caso. Dicho estatuto procesal dispone, en síntesis, en su inciso "(c)" que la acusación deberá contener una "exposición de los hechos esenciales constitutivos del delito, redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de

inteligencia común." Además, agrega que "dicha exposición no tendrá que emplear estrictamente las palabras usadas en la ley, y podrá emplear otras que tuvieren el mismo significado." Deberá, según el inciso "(d)", contener, además, la cita de la ley, reglamento o disposición que se alegue han sido infringidos, pero la omisión de tal cita o una cita errónea se considerará como un defecto de forma. Véase, Regla 35(c) y (d) de Procedimiento Criminal, *supra.* Un defecto de forma es una imperfección u omisión en la denuncia que no afecta derechos sustanciales, por lo que se trata de un error subsanable. D. Nevares Muñiz, *Sumario de Derecho Procesal Penal Puertorriqueño*, 10ma ed. rev., San Juan, Instituto de Derecho Puertorriqueño, 2014, págs. 120-121.

No obstante, la denuncia debe contener todos los elementos del delito. *Íd*, Véase, además, B. E. Bergman y otros, *Failure to allege essential elements*, in 1 Wharton's Criminal Procedure, sec. 5:10 (14th ed.). La falta de uno de los elementos invalida la convicción. *Nevares Muñiz, op. cit,* 121. Igualmente, la prueba no podrá enmendar la insuficiencia de la denuncia por razón de defecto sustancial. *Íd*; *Pueblo v. De Jesús Rosado*, 100 DPR 536, 538 (1972). Así pues, si no se ha corregido el defecto sustancial, la denuncia será defectuosa y no se podrá sostener la convicción. *Pueblo v. Saliva Valentín*, 130 DPR 767 (1992).

Para que el Ministerio Público pueda cumplir con lo anterior, no se le exige ningún lenguaje estereotipado o técnico en su redacción ni el uso estricto de las palabras dispuestas en el estatuto, solo se le exige que el contenido exponga todos los hechos constitutivos del delito. *Pueblo v. Vélez Rodríguez, supra,* pág. 629. De esa forma, "la función de la acusación o denuncia es crucial para el acusado pues, por virtud de ella, el acusado conoce los hechos que se le imputan, para que pueda preparar su defensa conforme a ellos". *Íd.*

Por su parte, la Regla 38 de Procedimiento Criminal, 34 LPRA Ap. II, R. 38, dispone sobre las enmiendas a la acusación, denuncia o escrito de especificaciones lo siguiente:

> Regla 38. Enmiendas a la acusación, denuncia o escrito de especificaciones
>
> (a) *Subsanación de defectos de forma.* Si la acusación, la denuncia o un escrito de especificaciones adolecieren de algún defecto, imperfección u omisión de forma aludido en la Regla 36, el tribunal podrá permitir en cualquier momento las enmiendas necesarias para subsanarlo. En ausencia de enmienda, dicho defecto, imperfección u omisión se entenderá subsanado una vez rendido el veredicto del jurado o el fallo del tribunal.
>
> (b) *Subsanación de defecto sustancial.* Si la acusación o la denuncia adolecieren de algún defecto u omisión sustancial, el tribunal en el cual se ventilare originalmente el proceso podrá permitir, en cualquier momento antes de la convicción o absolución del acusado, las enmiendas necesarias para subsanarlo. Si se tratare de una acusación, el acusado tendrá derecho a que se le celebre de nuevo el acto de la lectura de la acusación. Si se tratare de una denuncia, el acusado tendrá derecho a que el juicio se le celebre después de los cinco (5) días siguientes a aquel en que se hiciere la enmienda.

## C.

Ha sido política pública del Gobierno de Puerto Rico la cero tolerancia contra el crimen. A. Bermúdez Torres, *Delitos Especiales en Puerto Rico: Análisis de los Tipos Delictivos, Interrogatorios y Testimonios de Base,* Puerto Rico, LexJuris, 2022, pág. 40. De este modo, la Exposición de Motivos de la Ley de Armas de 2000, *supra,* señala que "**con el fin de erradicar el uso ilegal de armas con inmenso potencial de destrucción, esta Ley regula en forma particular, igual que la Ley Federal de Armas, la posesión o uso de cualquier arma de asalto semiautomática, sus copias o duplicados, en cualquier calibre**." (Énfasis nuestro). En lo pertinente, el Artículo 5.07 de la Ley de Armas de 2000, *supra,* dispone que:

> Toda persona que porte, posea o use sin autorización de esta Ley un arma larga semiautomática, una ametralladora, carabina, rifle, así como cualquier modificación de éstas o cualquiera otra arma que pueda ser disparada automáticamente o escopeta de cañón

cortado a menos de dieciocho (18) pulgadas, y que pueda causar grave daño corporal, incurrirá en delito grave, y convicta que fuere será sancionada con pena de reclusión por un término fijo de veinticuatro (24) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta.

No constituirá delito la posesión o uso de estas armas en el cumplimiento del deber por los miembros de la Policía, y aquellos otros agentes del orden público debidamente autorizados.

De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de treinta y seis (36) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dieciocho (18) años. 25 LPRA sec 458f.

Los elementos del delito del Artículo 5.07 son: a) poseer, portar o usar; b) sin autorización en ley; c) un arma larga semiautomática, una ametralladora, carabina, rifle, así como cualquier modificación de éstas o cualquiera otra arma que pueda ser disparada automáticamente o escopeta de cañón cortado a menos de dieciocho (18) pulgadas, y que pueda causar grave daño corporal.

El Artículo 1.02 (s) de la Ley de Armas de 2000, define portación como "la posesión inmediata o la tenencia física de un arma, cargada o descargada, sobre la persona del portador, entendiéndose también cuando no se esté transportando un arma de conformidad a como se dispone en esta Ley." 25 LPRA sec. 455. Igualmente, el referido estatuto define arma automática como "un arma, de cualquier descripción, independientemente de su tamaño y sin importar por qué nombre se le designe o conozca, cargada o descargada, que pueda disparar repetida o automáticamente un número de balas contenidas en un abastecedor, cinta u otro receptáculo, mediante una sola presión del gatillo." Artículo 1.02 (b), *supra.*

Por otro lado, la portación de armas de fuego sin licencia está regulada en el Artículo 5.04 de la Ley de Armas de 2000, 25 LPRA

sec. 458c.[145] Asimismo, la Ley de Armas de 2000, *supra*, define licencia de arma de fuego como "aquella licencia concedida por el Superintendente que autorice al concesionario para tener, poseer y transportar armas, sus municiones, **y dependiendo de su categoría,** portar armas de fuego, tirar al blanco o cazar." (Énfasis nuestro). Artículo 1.02 (o), *supra*.

Cabe señalar que el Tribunal Supremo de Puerto Rico, interpretando el Artículo 5.04 de la Ley de Armas de 2000, *supra*, resolvió que para alcanzar la culpabilidad de un acusado por posesión o portación más allá de duda razonable, "el Ministerio Público no puede descansar únicamente en la presunción de ausencia de licencia, sino que está compelido a presentar prueba, directa o circunstancial, tanto de la portación del arma como de la falta de licencia para portarla". *Pueblo v. Meléndez Monserrate*, 2024 TSPR 80. De este modo, quedó revocado el caso de *Pueblo v. Pacheco*, 78 DPR 24 (1955), el cual relevaba al Estado de la obligación de probar el elemento de ausencia de licencia.

Ahora bien, se desprende de lo anterior que, el Artículo 5.07 del referido estatuto regula separadamente la posesión o portación de armas automáticas. Según Abelardo Bermúdez Torres, la regulación separada de estas armas **obedece al daño potencial que pueden ocasionar**. Bermúdez Torres, *op. cit.*, pág. 68. Incluso, la Ley de Armas de 2000, prohíbe expresamente la licencia de armas automáticas a las agencias de seguridad que se dediquen al transporte de valores en vehículos blindados. Artículo 4.01 de la Ley de Armas de 2000, 25 LPRA sec. 457f. De igual modo, el Artículo

---

[145] "Toda persona que transporte cualquier arma de fuego o parte de ésta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas, incurrirá en delito grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta" Artículo 5.04 de la Ley de Armas de 2000, *supra*.

5.02 de la Ley de Armas de 2000, prohíbe la venta de armas de fuego a cualquier persona que no posea licencia. 25 LPRA sec. 458a. Sin embargo, el Artículo 5.03 prohíbe expresamente la venta, alquiler, o cualquier forma de disposición de las armas de fuego **que puedan ser disparadas automáticamente**; esto sin hacer la distinción de si la persona posee o no licencia para portar armas. 25 LPRA sec. 458b. Añade dicho artículo que "no aplicará a la venta o entrega de una ametralladora o cualquier otra arma de fuego que pueda ser disparada automáticamente **para uso de la Policía y otros agentes del orden público**." (Énfasis nuestro). *Íd.*

### D.

La Constitución de Puerto Rico y la Constitución de los Estados Unidos contienen disposiciones que protegen a los ciudadanos contra registros y allanamientos irrazonables que lleve a cabo el Estado en los hogares, vehículos, efectos personales o cualquier propiedad o lugar en el que el ciudadano tenga una expectativa razonable a la intimidad. *Pueblo v. López Colón*, 200 DPR 273, 283 (2018). En específico, la Sec. 10 del Art. II de la Constitución de Puerto Rico establece lo siguiente:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> No se interceptará la comunicación telefónica.
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
>
> Evidencia obtenida en violación de esta sección será inadmisible en los tribunales. Art. II, Sec. 10, Const. PR, LPRA, Tomo 1. [146]

---

[146] La Constitución de los Estados Unidos Establece: "No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá ningún mandamiento, sino [en] virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado, y las personas o cosas que han de ser detenidas o incautadas. Emda. IV, Const. EE. UU., LPRA, Tomo 1."

Este precepto constitucional tiene el propósito de proteger el derecho a la intimidad y dignidad del individuo, amparar sus documentos y pertenencias frente a actuaciones irrazonables del Estado e interponer la figura del juez para ofrecer una mayor garantía de razonabilidad a la intervención con los ciudadanos. *Pueblo v. López Colón, supra*, 284.

Asimismo, como regla general, será necesario obtener una orden judicial previa para efectuar un registro o allanamiento. "[U]n registro o incautación sin orden judicial produce una presunción de invalidez, por lo que compete al Ministerio Público rebatirlo mediante la presentación de prueba sobre las circunstancias especiales que requirieron esa intervención." *Pueblo v. Malavé González*, 120 DPR 470, 476–477 (1988). Así, la evidencia incautada sin una orden previa no se admitirá en los tribunales. *Pueblo v. Báez López*, 189 DPR 918, 927–928 (2013).

Ante un reclamo de que se violó el derecho constitucional contra los registro y allanamientos, será necesario establecer que la persona tenía un derecho a abrigar una expectativa razonable de intimidad dentro de las circunstancias particulares que rodean el caso y si ese derecho está reconocido por nuestra sociedad. *Íd.* Luego de que se establece que la persona poseía una expectativa de intimidad, se realizará un balance de intereses entre esa expectativa y los intereses públicos que hayan motivado la actuación estatal. *Pueblo v. Yip Berríos*, 142 DPR 386, 409 (1997).

Ahora bien, un allanamiento sin una orden previa de un tribunal, por sí solo, no conlleva la inadmisibilidad de la evidencia obtenida. *Pueblo v. Báez López, supra,* pág. 930. Así, en lo pertinente, no se activa la cláusula constitucional cuando la evidencia ocupada ha sido abandonada. *Pueblo v. Ortiz Martínez*, 116 DPR 139 (1985).

Bajo la excepción de evidencia abandonada no existe una expectativa razonable de intimidad y que, por lo tanto, no se violenta el mandato constitucional. *Pueblo v. Báez López, supra,* pág. 930. Es decir, "no está presente ningún registro en dicha situación, y la propiedad así abandonada puede ser incautada sin la existencia de causa probable." *Pueblo v. Ortiz Zayas,* 122 DPR 567, 571 (1988). Por tanto, la evidencia ocupada por abandono puede ser usada en contra de la persona acusada. *Íd.*

Para evaluar si una persona conserva una expectativa de intimidad ante un objeto abandonado debemos evaluar los siguientes criterios:

> (1) si el abandono fue voluntario o inadvertido; (2) el lugar donde ocurrió el abandono; (3) las circunstancias en que fue abandonado; (4) la naturaleza y las características del objeto abandonado; (5) si hubo intentos de recuperación del objeto abandonado; (6) el tiempo transcurrido entre el abandono y el intento de recuperación, y (7) las medidas tomadas para preservar la intimidad. *Pueblo v. Ramírez Lebrón,* 123 DPR 391, 402–403 (1989) (Sentencia) (Opinión Concurrente del Juez Asociado Negrón García).

Igualmente, cabe señalar que esta excepción se trata de una modalidad de testimonio estereotipado. Nevares Muñiz, *op. cit.,* pág. 94. La profesora nevares Muñiz señala que "[c]onsiste generalmente en una declaración por un agente encubierto o policíaco a los efectos de que el acusado al saberse descubierto por el agente, se deshizo de la evidencia en su poder, arrojándola a suelo." *Íd.* El Tribunal Supremo de Puerto Rico ha establecido unos criterios para evaluar la credibilidad del testimonio estereotipado:

> En primer término, reiteramos que todo testimonio estereotipado debe escudriñarse con especial rigor.
> Segundo, tanto los casos de la-evidencia-abandonada-o-lanzada-al-suelo como los casos del acto-ilegal-a-plena-vista deben, en ausencia de otras consideraciones, inducir sospecha de la posible existencia de testimonio estereotipado.
> Tercero, si el testimonio es inherentemente irreal o improbable debe ser rechazado.
> Cuarto, el testimonio estereotipado puede perder su condición de tal si, yendo más allá de los datos

indispensables para probar los requisitos mínimos de un delito, se le rodea de las circunstancias en que funciona el agente, el término de su investigación, los resultados obtenidos fuera del caso en trámites y otros detalles. Se exhorta en este sentido a recordar los factores mencionados sobre este particular en Pueblo v. Ayala Ruiz, supra y casos subsiguientes.

Quinto, por el contrario, la presencia de contradicciones, lagunas o vaguedades en el testimonio debe tender a reforzar el recelo con que hay que escuchar esta clase de declaraciones.

Sexto, no debe olvidarse que el peso de la prueba de librar el testimonio estereotipado de sospecha recae en el fiscal. Tal peso no se descarga con la extracción del testimonio flaco y descarnado a que se refirió Ayala Ruiz. *Pueblo v. González de Valle*, 102 DPR 374, 378 (1974).

### III.

Analizado con detenimiento el expediente del caso de epígrafe, procedemos a resolver. Los errores presentados por Rodríguez Rodríguez serán discutidos por separado.

En lo pertinente, el Artículo 5.07 de la Ley de Armas, *supra*, dispone:

Toda persona que porte, **posea o use sin autorización de esta Ley un arma larga semiautomática, una ametralladora, carabina, rifle, así como cualquier modificación de éstas o cualquiera otra arma que pueda ser disparada automáticamente o escopeta de cañón cortado a menos de dieciocho (18) pulgadas, y que pueda causar grave daño corporal**, incurrirá en delito grave, y convicta que fuere será sancionada con pena de reclusión por un término fijo de veinticuatro (24) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. (Énfasis nuestro).

Como bien señalamos previamente, los elementos del delito del Artículo 5.07 son: a) poseer, portar o usar; b) sin autorización en ley; c) un arma larga semiautomática, una ametralladora, carabina, rifle, así como cualquier modificación de éstas o cualquiera otra arma que pueda ser disparada automáticamente o escopeta de cañón cortado a

menos de dieciocho (18) pulgadas, y que pueda causar grave daño corporal.

En el caso ante nuestra consideración el Ministerio Público presentó la siguiente acusación contra el apelante:

> El referido acusado, FELIX OTERO TORRES, actuando en concierto y común acuerdo con otras personas, allá en y para el día 14 de julio de 2011, en Toa Baja, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala Superior de Bayamón, Puerto Rico, **ilegal, voluntaria, maliciosa y criminalmente, PORTABA Y CONDUCIA, un PISTOLA MARCA GLOCK, MODELO 23, SERIE CFX-278, COLOR NEGRA, CALIBRE 40, cargada con 23 municiones y una en la recamara, que puede ser disparada automáticamente, la cual es un arma mortífera de las estrictamente prohibidas por la ley de armas de Puerto Rico. Al momento de portar y conducir dicha arma, lo hacía desprovisto de una licencia o permiso especial que para tales fines expide el Superintendente de la Policía de Puerto Rico y/o el Tribunal de Primera Instancia de Puerto Rico.** (Énfasis nuestro).

Como se sabe la acusación deberá contener una "exposición de los hechos esenciales constitutivos del delito, **redactada en lenguaje sencillo, claro y conciso**, y de tal modo que pueda entenderla cualquier persona de inteligencia común." (Énfasis nuestro). Regla 35 de Procedimiento Criminal, *supra*. Además, la "exposición **no tendrá que emplear estrictamente las palabras usadas en la ley**, **y podrá emplear otras que tuvieren el mismo significado**." (Efasis nuestro). *Íd.* Asimismo, la acusación deberá contener todos los elementos del delito. Nevares Muñiz, *op. cit.*, pág. 121. La falta de uno de los elementos invalida la convicción. *Íd.* Sin embargo, **no se exige ningún lenguaje estereotipado o técnico en su redacción ni el uso estricto de las palabras dispuestas en el estatuto, solo se le exige que el contenido exponga todos los hechos constitutivos del delito**. *Pueblo v. Vélez Rodríguez, supra*, pág. 629.

Se desprende claramente de la acusación presentada por el Ministerio Público que esta contiene todos los elementos del delito

necesarios para que recaiga una convicción válida contra Rodríguez Rodríguez. La acusación establece que Rodríguez Rodríguez **portaba y conducía**, **ilegal, voluntaria, maliciosa y criminalmente**, una **PISTOLA MARCA GLOCK, MODELO 23, SERIE CFX-278, COLOR NEGRA, CALIBRE 40, cargada con 23 municiones y una en la recamara**, **que puede ser disparada automáticamente**, **la cual es un arma mortífera de las estrictamente prohibidas por la ley de armas de Puerto Rico**. Añade la acusación que "al momento de portar y conducir dicha arma, **lo hacía desprovisto de una licencia o permiso especial que para tales fines expide el Superintendente de la Policía de Puerto Rico y/o el Tribunal de Primera Instancia de Puerto Rico**." Así pues, el lenguaje utilizado por el Ministerio Público en la acusación contra Rodríguez Rodríguez expone todos los elementos constitutivos de delito establecidos en el Artículo 5.07 de la Ley de Armas, *supra*, por lo que no se cometió el tercer error.

En cuanto al elemento de que el arma sea capaz de disparar automáticamente que establece el referido delito, surge de la transcripción de la prueba presentada que durante el juicio se estipuló el certificado de examen (AF112699), el cual establece sobre la pistola que "su condición actual es capaz de disparar en **automático** *full*..." (Énfasis nuestro).[147] Ante ello resulta evidente que esta demuestra la capacidad del arma de disparar automáticamente. Además, se desprende del testimonio de la agente Méndez Acevedo que esta observó a Rodríguez Rodríguez el día de los hechos con un arma de fuego que contenía un aditamento el cual permitía disparar más de una bala.[148] Este testimonio fue creído por el foro primario y merece nuestra deferencia. De este modo, somos

---

[147] Véase TPO, pág. 403, líneas 9-14.
[148] TPO, págs. 252-254.

del criterio que no se cometió el primer error señalado por la parte apelante.

Por otro lado, sobre el segundo error, resolvemos que el Artículo 5.07 de la Ley de Armas de 2000, *supra*, no requiere que el imputado conozca la naturaleza automática del arma para ser imputable del delito. La mera portación constituye evidencia del conocimiento de la naturaleza automática del arma. De hecho, la profesora Nevares Muñiz señala que:

> En esos casos se presume que la persona que tiene su posesión sea directa o constructiva (junto o con otra persona), tiene conocimiento, control y manejo del bien. **Se entiende que el elemento mental está implícito en la voluntariedad de la posesión y en el conocimiento de la ilegalidad del bien**. Le corresponde a la persona inocente demostrar que no tenía conocimiento, control, ni manejo del bien. (Énfasis nuestro). D. Nevares Muñiz, *Derecho Penal Puertorriqueño: Parte General*, 7ma. ed. rev., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2015, pág. 203.

Incluso, la Ley de Armas de 2000, *supra*, contiene presunciones en donde la mera posesión, portación, y hasta la mera presencia de un arma de fuego, se considera evidencia *prima facie* de que la persona tiene la intención de cometer delito. Artículo 5.11 de la Ley de Armas de 2000, 25 LPRA sec. 458j. Por tanto, el segundo error no se cometió.

En cuanto al cuarto error, resolvemos que no se cometió el mismo. Nos explicamos. El Tribunal Supremo de Puerto Rico resolvió en el caso de *Pueblo v. Meléndez Monserrate*, *supra*, que el Ministerio Público deberá presentar prueba, directa o circunstancial, sobre la portación de arma, como de la falta de licencia para portarla. Ahora bien, la Ley de Armas de 2000, *supra*, regula separadamente la portación de armas de fuego sin licencia y la portación de armas automáticas. Véanse, Artículo 5.04 y 5.07 de la Ley de Armas de 2000, *supra*. **Ello se debe al daño potencial que pueden ocasionar**. Bermúdez Torres, *op. cit.*, pág. 68.

La Ley de Armas de 2000, *supra,* define licencia de arma de fuego como "aquella licencia concedida por el Superintendente que autorice al concesionario para tener, poseer y transportar armas, sus municiones, **y dependiendo de su categoría**, portar armas de fuego, tirar al blanco o cazar" (Énfasis nuestro). Es decir, dicha ley hace la salvedad que, **dependiendo de su categoría**, será concedida la licencia por el Superintendente para portar armas de fuego. De hecho, la propia Ley de Armas de 2000, prohíbe expresamente la **licencia de armas automáticas** a las agencias de seguridad que se dediquen al transporte de valores en vehículos blindados. Artículo 4.01 de la Ley de Armas de 2000, *supra.* Igualmente, añadimos que la Ley de Armas de 2000 prohíbe claramente la disposición de armas de fuego automáticas, sin importar si la persona posee o no licencia para portar arma. Artículo 5.03, *supra.* Sin embargo, la Ley de Armas de 2000 solo autoriza la posesión o uso de armas automáticas a los miembros de la Policía y del orden público que estén en el cumplimiento del deber. Artículo 5.07, *supra*; Artículo 5.03, *supra.* No obstante, esta prohibición no aplicará "a la venta o entrega de una ametralladora o cualquier otra arma de fuego que pueda ser disparada automáticamente para uso de la Policía y otros agentes del orden público." *Íd.*

Estudiada cuidadosamente la transcripción de la prueba oral, examinados los autos originales, así como la prueba documental, y habiendo dado la debida consideración a los alegatos de las partes de epígrafe, procede confirmar el dictamen apelado.

**IV.**

Por los fundamentos que anteceden, confirmamos la *Sentencia* apelada, en todos sus extremos.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

La jueza Rivera-Marchand respetuosamente disiente por entender que, lo resuelto el 19 de julio de 2024 por el Tribunal

Supremo en *Pueblo v. Meléndez Monserrate,* 2024 TSPR 80, atinente al derecho constitucional a la presunción de inocencia y al debido proceso de ley, resulta aplicable a la presente causa, toda vez que, uno de los elementos del delito imputado, es la ausencia de autorización para la portación del arma indicado en el pliego acusatorio. Nuestro ordenamiento jurídico reconoce que, la presunción no tendrá efecto alguno de variar el peso de la prueba sobre los elementos del delito o de refutar una defensa de la persona acusada. Íd. a la pág. 25 citando la Regla 303 de las Reglas de Evidencia 32 LPRA Ap. VI. A pesar de que, a la fecha de la celebración del juicio, el Ministerio Público descansó en la doctrina establecida en *Pueblo v. Pacheco,* 78 DPR 24 (1955), la cual relevaba al fiscal de presentar prueba sobre dicho elemento del delito, lo cierto es que, la norma jurídica adoptada recientemente en *Pueblo v. Meléndez Monserrate,* supra revoca dicho precedente. Por ello, se obliga al Ministerio Público de presentar prueba directa o circunstancial, sobre todos los elementos del delito incluidos por el Legislador, según surge expresamente del texto del delito imputado aun cuando versa sobre una presunción. Siendo de carácter constitucional, la nueva doctrina aplica en este caso. Véase *Pueblo v. Torres Rivera II,* 204 DPR 288 (2020). En su consecuencia, procede la revocación de la *Sentencia* apelada y la celebración de un nuevo juicio como cuestión de derecho.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones
